RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0061p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

KEITH RUSSELL, on behalf of himself and all others who are similarly situated,

        _Plaintiff-Appellee_,

    _v._

CITIGROUP, INC. and CITICORP CREDIT SERVICES, INC.,

        _Defendants-Appellants_.

No. 13-5994

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington
No. 2:12-cv-00016—David L. Bunning, District Judge.

Argued: March 12, 2014

Decided and Filed: April 4, 2014

Before: MERRITT, SUTTON and GRIFFIN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Samuel S. Shaulson, MORGAN, LEWIS & BOCKIUS LLP, New York, New York, for Appellants. Richard M. Paul III, PAUL MCINNES LLP, Kansas City, Missouri, for Appellee. **ON BRIEF:** Samuel S. Shaulson, MORGAN, LEWIS & BOCKIUS LLP, New York, New York, Sari M. Alamuddin, Christopher J. Boran, Matthew A. Russell, MORGAN, LEWIS & BOCKIUS LLP, Chicago, Illinois, for Appellants. Richard M. Paul III, PAUL MCINNES LLP, Kansas City, Missouri, Franklin D. Azar, Keith R. Scranton, FRANKLIN D. AZAR & ASSOCIATES, P.C., Aurora, Colorado, William H. Wilhoit, WILHOIT LAW OFFICE, Grayson, Kentucky, for Appellee.

1

———————————

**OPINION**

———————————

SUTTON, Circuit Judge.    When Keith Russell accepted a job with Citicorp Credit Services, he agreed to arbitrate "all employment-related disputes" with the company.  Does that mean he must arbitrate a case already pending in court when he signed the agreement?  We think not.

I.

From 2004 to 2009, Russell worked at Citicorp's call center in Florence, Kentucky.  As a condition of employment, he signed a standard contract to arbitrate his disputes with the company.  The agreement covered individual claims but not class actions.

In January 2012, Russell filed a class action against the company.  He claimed that the company did not pay its employees for time spent logging into and out of their computers at the beginning and end of each workday.  Because the arbitration agreement with Russell did not reach class claims, the company did not seek arbitration.

At this point, a confluence of improbable circumstances complicated this once-simple case.  In late 2012, with the lawsuit still in progress, Russell applied to work once more at Citicorp's call center in Florence.  The call center agreed to rehire him.  By this time, Citicorp had updated its standard arbitration contract to cover class claims as well as individual ones. Russell signed the new contract, and in January 2013 he began work in the call center.

Russell did not consult with his lawyers before signing the new contract.  And the lawyers directly representing Citicorp in this case, an outside law firm, did not know that Russell had applied to work at the call center.  About a month after Russell began his new job, they found out.  Relying on the new contract, Citicorp sought to compel Russell to arbitrate the class action, which by then had begun discovery.  The district court concluded that the new arbitration agreement did not cover lawsuits commenced before the agreement was signed.  Citicorp

appealed this interlocutory decision, as it may under 9 U.S.C. § 16(a). *See Grain v. Trinity Health, Mercy Health Servs.*, 551 F.3d 374, 377 (6th Cir. 2008).

## II.

A section of the arbitration agreement, captioned "Scope of Policy," provides:

> This Policy applies to both you and to Citi, and makes arbitration the required and exclusive forum for the resolution of all employment-related disputes (other than disputes which by statute are not subject to arbitration) which are based on legally protected rights (i.e., statutory, regulatory, contractual, or common-law rights) and arise between you and Citi, its predecessors, successors and assigns, its current and former parents, subsidiaries, and affiliates, and its and their current and former officers, directors, employees, and agents . . . .

R. 52-7 at 2.  The question is whether this language applies to the pending class action.

The text suggests that the agreement does not evict pending lawsuits from court.  It covers only disputes that "arise between [Russell] and Citi." *Id.*  The use of the present-tense "arise," rather than the past-tense "arose" or present-perfect "have arisen," suggests that the contract governs only disputes that begin—that arise—in the present or future.  The present tense usually does not refer to the past. *See Carr v. United States*, 560 U.S. 438, 448 (2010).

The preamble of the agreement—labeled "Statement of Intent"—adds force to what the conjugation of this verb suggests.  It explains, "Citi values each of its employees and looks forward to good relations with, and among, all of its employees.  Occasionally, however, disagreements may arise between an individual employee and Citi . . . Citi believes that the resolution of such disagreements will be best accomplished . . . by external arbitration." R. 52-7 at 2.  This language exudes prospectivity.  It says that the company "looks *forward*" to a good relationship with Russell, not that it looks back on their earlier relationship with fond memories.  It then acknowledges that disagreements "may arise," not that disagreements "might have arisen."  As used here, the auxiliary verb "may" signals a hazard that is yet to come rather than an incident that has come to pass. *See* "may, *v.[1]*," *Oxford English Dictionary* (3d ed. 2012).  Bringing the point home, the agreement explains that the resolution of these disputes "*will be* best accomplished" by arbitration.  So far as the text of the agreement and its preamble show, the parties signed this agreement to head off future lawsuits, not to cut off existing ones.

The common expectations of the parties reinforce the point. *In re AmTrust Fin. Corp.,* 694 F.3d 741, 756 (6th Cir. 2012). Russell for one says that he expected the contract to apply only to future lawsuits. Citicorp does not question his state of mind, and in any event the circumstances corroborate it. Russell's behavior—signing the contract without consulting counsel and carrying on with the lawsuit as before—would make little sense if Russell understood the contract to cover the case at hand.

As for Citicorp, it seems doubly improbable that the company expected the contract to govern pending lawsuits. In the first place, the company entered into this contract—binding itself to arbitrate its disputes with Russell—without first consulting its lawyers in this case. Would a sophisticated company allow a supervisor at a local call center to sign away rights in a pending case without first speaking to the lawyers representing it in that case? Not likely.

In the second place, the company sent the contract to Russell rather than to his lawyer. One party's lawyer may not communicate about a pending case with an opposing litigant he knows has legal representation. Ky. Sup. Ct. R. 3.130; *see also* Model Rules of Professional Conduct R. 4.2 (1983). If Citicorp's in-house counsel prepared a contract, expecting it to be given to a represented litigant but also expecting it to govern existing cases, they might find themselves near the edge of this rule. It makes no difference who handed Russell the arbitration agreement, whether a member of the legal department or a supervisor at the call center. The canons preclude a lawyer not only from communicating with a represented adversary but also (for the most part) from helping his client do so. *See Restatement (Third) of the Law Governing Lawyers* § 99, cmt. k (2000). And it makes no difference who prompted the dialogue, whether Russell or Citicorp. The lawyer's obligations remain in place either way. *See* Ky. Sup. Ct. R. 3.130, cmt. (3).

To be sure, we do not mean to suggest that Citicorp's in-house counsel violated the rules of ethics. Perhaps they did not participate in the drafting of this contract. Or perhaps they did not know that the company planned to give the contract to represented employees. But we do mean to ask: Did Citicorp expect the contract to bear a meaning that would even raise these questions? Again, not likely.

Against all of this, Citicorp offers no evidence that it *did* expect the contract to govern pending lawsuits. In the final analysis, that leaves a situation in which one party (Russell) certainly and the other party (Citicorp) likely expected the contract to govern only lawsuits still to come. This common understanding fixes the meaning of the contract. *See Restatement (Second) of Contracts* § 201(1) (1981).

No matter, Citicorp claims: The provision before us—"This Policy [covers] *all* employment-related disputes . . . which . . . arise between [Russell] and Citi"—still proclaims with a clear throat that the arbitrator will decide pending and impending cases alike. But milieu limits the reach of general words like "all." *See United States v. Palmer*, 3 Wheat. 610, 631–32 (1818) (Marshall, C.J.). If the poissonier tells the chef, "I have marinated all the salmon," we know from context that he means all the salmon on the kitchen counter, not all the salmon in the universe. So too here. We know from context—from the use of "arise," from the preamble and from the parties' probable expectations—that the contract refers to all future lawsuits, not all lawsuits from the beginning of time to the end.

Citicorp persists that our interpretation nullifies language extending the contract to disputes between Russell and the company's "*predecessors*, successors and assigns, its current and *former* parents, subsidiaries, and affiliates, and its and their current and *former* officers, directors, employees, and agents." R. 52-7 at 2 (emphasis added). Not so. Imagine that yesterday a supervisor suspended Russell because of his sex, today the company fires the supervisor for her misconduct, and tomorrow Russell sues the company and the supervisor for discrimination. The phrase "former officers, directors, employees, and agents" brings this hypothetical dispute within the agreement's grasp, even though the supervisor no longer works for the company. The references to past employees and past affiliates do not establish that the agreement governs past cases.

That brings us to Citicorp's last and best contention: The Federal Arbitration Act requires us to resolve "any doubts concerning the scope of arbitrable issues . . . in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). This is a fair point—in the abstract. In the context of this case, however, the arbitration agreement leaves no doubt about its scope. Russell expected the agreement to cover only future

lawsuits, and we must presume Citicorp expected it to cover only future lawsuits. That means the agreement covers only future lawsuits. In arbitration contracts, "as with any other contract, the parties' intentions control." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010).

A court must interpret a provision in a contract not in isolation, but against the backdrop of "the contract as a whole, . . . the situation of the parties and the conditions under which the contract was written." *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003). The Federal Arbitration Act's presumption of arbitrability does not cut this process short. It is a presumption, not a clear-statement rule. That is why one of two things—either "an express provision excluding a specific dispute" *or* "forceful evidence of a purpose to exclude the claim"—may take a case beyond the domain of an arbitration clause. *Watson Wyatt & Co. v. SBC Holdings, Inc.*, 513 F.3d 646, 650 (6th Cir. 2008). "Forceful evidence" describes just what we have here.

All in all, "arbitration is a matter of consent, not coercion." *Stolt-Nielsen*, 559 U.S. at 681. A court deciding whether to order arbitration must determine whether the parties agreed to arbitrate the case at hand. Context shows that they did not in this instance. Using the presumption of arbitrability to extend the contract to this class action, even though neither Russell nor Citicorp expected the contract to stretch that far, means "los[ing] sight of the purpose of the exercise: to give effect to the intent of the parties." *Id.* at 684.

For these reasons, we affirm.