In re George A. BAVELIS, Debtor.

George A. Bavelis, Plaintiff,

v.

Ted Doukas, et al., Defendants.

Bankruptcy No. 10–58583.
Adversary No. 10–2508.

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division,
at Columbus.

Signed Sept. 26, 2014.

Philomena S. Ashdown, The Federal Reserve Building, Cincinnati, OH, for defendants BMAQ, LLC, BNK Real Estate, LLC, FLOVEST, LLC, Financial Lending Services, LLC, GMAQ, LLC, MAQ Management, Qureshi Family, LLC, Mahammad Qureshi, Masroor Rab.

Mark Edwin Brown, Menefee & Brown PC, Knoxville, TN, for defendant Ted Doukas.

Melissa S. Giberson, Vorys, Sater, Seymour and Pease LLP, Columbus, OH, Tiffany Strelow Cobb, Columbus, OH, for defendants Nemesis of LI Corp., Quick Capital of LI Corp., R.P.M. Recoveries, Inc., Ted Doukas, Leftheris Properties Corporation.

Jerry E. Peer, Jr., Peterson Conners Fergus & Peer, LLP, Columbus, OH, Gary A. Goldstein, Baltimore, MD, Istvan Gajary, Peterson, Conners, Fergus & Peer, LLP, Columbus, OH, for defendants Blair International, Inc., Leftheris Properties Corporation, Nemesis of LI Corp., Quick Capital of LI Corp., R.P.M. Recoveries, Inc., Ted Doukas.

W. Mark Jump, Columbus, OH, for Plaintiffs Bavelis Family, LLC, FLOHIO, LLC.

Marion H. Little, Jr., Columbus, OH, for plaintiffs George A. Bavelis, Bavelis Family, LLC, FLOHIO, LLC.

Steven Newburgh, Steven S. Newburgh, P.A., West Palm Beach, FL, for BMAQ, LLC, Blair International, Inc., FLOVEST, LLC, GMAQ, LLC, George Real Estate Holdings, LLC.

## MEMORANDUM OPINION AND ORDER (A) HOLDING TED DOUKAS IN CIVIL CONTEMPT AND (B) ESTABLISHING PROCEDURES FOR DETERMINING DAMAGES

JOHN E. HOFFMAN, JR., Bankruptcy Judge.

### I. Introduction

George Bavelis, the Chapter 11 debtor in possession and the plaintiff in this adversary proceeding, contends that one of the defendants, Ted Doukas, knowingly violated an order of the Court that prohibited him from transferring certain assets and that required him to provide Bavelis unfettered access to certain documents. In direct contravention of the requirements imposed by this order, Doukas obstructed Bavelis's access to the documents. Among other things, when Bavelis asked Doukas for copies of the documents during discovery, Doukas lied and said he had no responsive documents. He then doubled down on his contempt, transferring assets

the order prohibited him from transferring. Having concluded—for the reasons detailed below—that Doukas engaged in contemptuous conduct, the Court establishes procedures for determining the amount of damages Bavelis may recover on behalf of his bankruptcy estate.

## II. Jurisdiction and Constitutional Authority

The Court has jurisdiction to hear and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(A) and (O).

The Court also has the constitutional authority to hear and determine the matter. *See In re Brown,* 511 B.R. 843, 848 (Bankr.S.D.Tex.2014) (holding that bankruptcy courts retain the constitutional authority to impose sanctions for contempt of a court order after *Stern v. Marshall,* ⸺ U.S. ⸺, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011)); *In re Green,* No. 12–13410, 2014 WL 1089843, at *1 (Bankr.N.D.Ohio Mar. 19, 2014) (same); *Schermerhorn v. CenturyTel, Inc. (In re SkyPort Global Commc'ns),* No. 08–36737–H4–11, 2013 WL 4046397, at *41 (Bankr.S.D.Tex. Aug. 7, 2013) (*"Stern* does not limit this Court's constitutional authority to enter an order enforcing the Court's own prior orders . . . .").

## III. Procedural History

On July 20, 2010 ("Petition Date"), Bavelis filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On October 20, 2010, Bavelis commenced this adversary proceeding and filed a motion for a preliminary injunction (Adv.Doc. 2). Bavelis served Plaintiff's First Set of Requests for Production of Documents to Each Defendant ("First Document Request") (Bavelis Ex. 4) the next day. After holding a telephonic status conference, the Court entered an agreed scheduling order ("Scheduling Order") (Adv.Doc. 42) providing that Doukas and the other defendants "shall produce their responses and objections to [the First Document Request], including all documents produced in response thereto, so that they are received in the offices of [Bavelis's] counsel by 10:00 a.m. on Friday, December 3, 2010." Scheduling Order ¶ 2.

The Court conducted a hearing on the motion for a preliminary injunction on December 14, 2010. After the hearing recessed and the parties conferred, they presented a draft agreed order regarding the motion for a preliminary injunction, and the Court entered an order granting preliminary injunctive relief on December 15, 2010 ("Injunction") (Adv.Doc. 78).

This matter is before the Court on Bavelis's two motions requesting that the Court enter an order directing Doukas to appear and show cause why he should not be held in civil contempt for violating the Scheduling Order and the Injunction. Those motions are located at Adv. Doc. 234 ("First Show Cause Motion") and Adv. Doc. 277 ("Second Show Cause Motion" and, together with the First Show Cause Motion, "Show Cause Motions"). Doukas filed a response to the First Show Cause Motion (Adv.Doc. 239) ("First Doukas Response"), and Bavelis filed a reply memorandum in support of that motion ("First Bavelis Reply") (Adv.Doc. 241). Likewise, Doukas filed a response to the Second Show Cause Motion (Adv.Doc. 279) ("Second Doukas Response"), and Bavelis filed a reply memorandum in support of that motion ("Second Bavelis Reply") (Adv.Doc. 281).

After the Show Cause Motions were filed, the Court entered an order ("Show Cause Order") (Adv.Doc. 424) directing Doukas to appear and show cause why he should not be held in contempt and sanc-

tioned for the acts and omissions described in the Show Cause Motions and in the First Bavelis Reply and the Second Bavelis Reply.[1] The Court conducted a hearing at which Doukas testified ("Show Cause Hearing"). At the Show Cause Hearing, Doukas moved for a directed judgment at the close of Bavelis's case, but the Court denied that motion. *See* Hearing Transcript ("Tr."), Adv. Doc. 511 at 86–112.

During the Show Cause Hearing, Bavelis's Exhibits 2 through 19, 21 through 23, and 47 were admitted into evidence.[2] Tr. at 77–86. At Doukas's request, the Court took judicial notice of Adv. Doc. 327 (Defendant/Third–Party Defendant RPM Recoveries, Inc.'s Motion to Compel Compliance with Injunction Order and its exhibits), and at Bavelis's request the Court took judicial notice of Adv. Doc. 340 (Memorandum in Opposition of Plaintiff George A. Bavelis to Defendant/Third–Party Defendant RPM Recoveries, Inc.'s Motion to Compel Compliance with Injunction Order and its exhibits). Tr. at 119–20. At the request of the parties, the Court also took judicial notice of the exhibits attached to the First Show Cause Motion, the First Doukas Response, the First Bavelis Reply, the Second Show Cause Motion, the Second Doukas Response and the Second Bavelis Reply. Tr. at 85–86. Finally, the Court took judicial notice of the docket in Bavelis's bankruptcy case, including the claims register, and the docket in this adversary proceeding, as well as any other documents Doukas offered as exhibits that are on the Court's dockets that were not withdrawn during the Show Cause Hearing (Doukas Exhibits Q, V and W). Tr. at 113–19.

## IV. Background

Several years before the Petition Date, Bavelis and one of his business partners, Mahammad A. Qureshi, formed four limited liability companies, including GMAQ, LLC ("GMAQ") and FLOVEST, LLC ("FLOVEST"), for the purpose of investing in gas stations, office buildings and mixed-use real estate developments. Bavelis and Qureshi each owned one-half of GMAQ. In addition, Bavelis was the manager and indirect part owner of yet another company (FLOHIO, LLC) that owned one-half of FLOVEST; the other one-half owner of FLOVEST was one of Qureshi's companies, MAQ Management, Inc. In time, business disputes between Bavelis and Qureshi developed. *See Bavelis v. Doukas (In re Bavelis)*, 490 B.R. 258 (Bankr.S.D.Ohio 2013) (*"Bavelis I "*.)

Doukas then entered the picture. As *Bavelis I* sets forth in much greater detail, after Bavelis and Doukas became friends in early 2009, Doukas offered to help resolve the Bavelis–Qureshi disputes favorably to Bavelis. For the ostensible purpose of facilitating such a resolution, in December 2009, Doukas convinced Bavelis to sign documents purporting to transfer Bavelis's one-half interest in GMAQ and FLOHIO's one-half interest in FLOVEST to a Doukas-affiliated company, Nemesis of L.I. Corp. ("Nemesis").[3] Bavelis re-

---

1. The issuance of the Show Cause Order did not shift the burden of proof from Bavelis, but instead acted as notice to Doukas, informing him "what conduct is alleged to be sanctionable, and allowing him an "opportunity to respond[.]" *Cook v. Am. S.S. Co.*, 134 F.3d 771, 776 (6th Cir.1998).

2. Bavelis's original Exhibit 3 contained portions of the transcript of the December 9, 2010 deposition of Doukas. In response to the objection of Doukas's counsel, the entire deposition transcript ("Dep. Tr."), rather than certain excerpts offered by Bavelis, was submitted to the Court as Exhibit 3. Tr. at 81.

3. Bavelis had already transferred a portion of his interest in GMAQ to Blair International, Inc. ("Blair") and his entire interest in GMAQ to R.P.M. Recoveries, Inc. ("R.P.M."). Both

ceived no consideration for the transfers and expected the transfer documents to be returned to him once the deal with Qureshi was finalized—either that same day or soon afterward. When the documents still had not been returned over a month later, Bavelis came to believe—rightly so—that Doukas had spent the past year cultivating their friendship in order to deprive Bavelis of substantially all of his assets and that Doukas had used Nemesis as well as certain of his other companies, including Quick Capital of L.I. Corp. ("Quick Capital"), to perpetrate the scheme. *See Bavelis I,* 490 B.R. at 265 (disallowing claim filed by Quick Capital and holding that neither Doukas nor any of the various other entities affiliated with him hold claims against Bavelis's bankruptcy estate).

This factual background is not recited to support the Court's conclusion that Doukas later engaged in contemptuous conduct, and the Court does not consider it in reaching the determination that he did so. The Court simply provides the background in order to explain one of the reasons Bavelis commenced the adversary proceeding and sought the Injunction—to attempt to unwind the transfers to Nemesis and to maintain the status quo while he was seeking that result.[4]

### V. Findings of Fact

Based on the evidence adduced at the Show Cause Hearing, including the documentary evidence and the testimony presented, and having considered the demeanor and credibility of the sole witness—Doukas—the Court makes the findings of fact set forth below.

### A. Documents Doukas Signed Before the Court Issued the Injunction

Doukas used Nemesis to place assets under his sole control after the December 2009 transfers. In June 2010, Doukas, acting in his capacity as the president of Nemesis—which purportedly was acting as the managing member of FLOVEST—signed two Quit Claim Deeds identifying FLOVEST as the grantor of parcels of real property in Orange County, Florida and Leftheris Properties Corporation ("Leftheris"), a company whose sole shareholder, director and officer is Doukas, as the grantee. Tr. at 26, 61. The Quit Claim Deeds were recorded in Orange County in September 2010. Bavelis's Exs. 12 and 13.

The following month, Doukas signed an Assignment of Mortgage in his capacity as the president of Nemesis, which this time purportedly was acting as the managing member of GMAQ. Bavelis Ex. 11. The Assignment of Mortgage identified GMAQ as the assignor and Leftheris as the assignee of a mortgage ("Mortgage") "by Noel Stephen O'Brien . . . in favor of GMAQ, LLC on lands in the County of Palm Beach, State of Florida [ ('O'Brien Property') ]." The Assignment of Mortgage was recorded in Palm Beach County on July 9, 2010. Bavelis Ex. 11. Bavelis then commenced his bankruptcy case and this adversary proceeding.

### B. Discovery Conducted by Bavelis Before the Hearing on the Injunction

Doukas withheld the Quit Claim Deeds and the Assignment of Mortgage from Ba-

---

Blair and R.P.M. are controlled by Doukas. *See Bavelis,* 490 B.R. at 283 n. 10, 296.

4. The adversary proceeding also sought relief against Qureshi and certain entities affiliated with him. Bavelis and Qureshi subsequently resolved their differences and entered into a settlement agreement that has been approved both by this Court and by the Bankruptcy Court for the Southern District of Florida, which is presiding over Qureshi's own bankruptcy case.

velis on more than one occasion during discovery that Bavelis conducted before the Court issued the Injunction. As previously noted, the Scheduling Order directed Doukas and the other defendants to produce their responses (including documents) and objections to the First Document Request before the hearing on the motion for a preliminary injunction. The First Document Request sought the production of, among other documents:

4. Documents sufficient to identify all real or personal property, cash, stock and/or other asserts [sic] transferred (as well as the value and timing thereof) by each of the Companies since December 1, 2009.

5. Documents sufficient to identify the recipient(s) (i.e., transferees) of any and all transfers of real or personal property, cash, stock and/or other assets by each of the Companies since December 1, 2009.

6. Any agreements relating to any transfers of real or personal property, cash, stock and/or other assets by each of the Companies since December 1, 2009, and/or any agreements otherwise relating to assets transferred by each of the Companies since December 1, 2009.

First Doc. Req. at 10.

As used in the First Document Request, the term "Companies" was defined to include FLOVEST and GMAQ. First Doc. Req. at 9. Thus, the First Document Request required Doukas to produce all documents identifying assets that FLOVEST and GMAQ transferred since December 1, 2009. The Quit Claim Deeds and the Assignment of Mortgage fit the bill. And the First Document Request also required Doukas to produce any agreements relating to transfers of assets by FLOVEST and GMAQ since December 1, 2009—again requiring the production of the Quit Claim Deeds and the Assignment of Mortgage.

There is no evidence that Doukas produced those documents in response to the First Document Request. Tr. at 34–39.

Doukas had another opportunity to disclose the existence of the documents before the hearing on the motion for a preliminary injunction, but again failed to do so. Bavelis's counsel, Marion Little, deposed Doukas, asking him questions that, if answered honestly, would have disclosed the existence of the Quit Claim Deeds and the Assignment of Mortgage. Doukas, though, failed to respond truthfully to the questions:

As to FLOVEST, Little posed questions that required Doukas to disclose the existence of the Quit Claim Deeds, but Doukas lied and failed to do so:

Q. Have you undertaken any type of business on behalf of Flovest, LLC since December 16, 2009?

A. Yes. I own 50 percent.

Q. And what type of business have you undertaken on behalf of that company since December 16th, 2009?

A. I mean, not much to do there. Everything is under water.

Q. Well, let me ask it this way. Have you undertaken to sell any of the property?

A. No, nothing to sell.

Q. Okay. Have you undertaken to transfer any of the property?

A. No.

Dep. Tr. at 45.

Similarly, Little asked questions that required Doukas to disclose the existence of the Assignment of Mortgage, but again Doukas lied:

Q. Now, as it relates to GMAQ, LLC, since December of 2009 what type of business activities have you undertaken for that company?

A. Not much.

. . . .

Q. I just want to find out what you understand, which as I understand your testimony, you do not have any knowledge of any business transactions occurring with GMAQ since December of 2009?

A. You are right.

Dep. Tr. at 46, 47. *See also* Dep. Tr. at 64 (Doukas responding "Yes" when Little asked whether "whatever you have as it relates to [GMAQ and FLOVEST], you've collected and made available to us, correct?" and responding "No, no" when Little asked "You didn't withhold anything, did you?").[5]

In sum, during his deposition, Doukas disclaimed knowledge of transactions consummated by FLOVEST and GMAQ since December 2009 even though in June 2010 he had signed the Quit Claim Deeds, purporting to transfer parcels of real property in Orange County from FLOVEST to Leftheris, and even though in July 2010 he had signed the Assignment of Mortgage, purporting to transfer the Mortgage from GMAQ to Leftheris. During the Show Cause Hearing, Doukas testified that he could not remember why he failed to disclose the existence of the Quit Claim Deeds or the Assignment of Mortgage during his deposition. Tr. at 43–44.

While unacceptable, Doukas's failure to disclose the existence of the Quit Claim Deeds and the Assignment of Mortgage during his deposition did not violate the Injunction for the simple reason that the Injunction had not yet been issued. Doukas's pre-Injunction conduct is relevant here nonetheless. As discussed in more detail below, among his other excuses for his contemptuous conduct, Doukas testified that he gave all the documents he had to his attorney at the time, who failed to produce them. No one but Doukas and the attorney (and those they have chosen to tell) know whether it is true that Doukas gave him the documents, as Doukas apparently has declined to produce the files. But even if Doukas's testimony in this regard were true, Doukas cannot blame the attorney for his own lies during his deposition.[6] And Doukas's own deceitfulness as to the Quit Claim Deeds and the

---

**5.** In addition, when Little requested that Doukas identify companies he owns, Doukas was able to recall six of them, but conveniently forgot to mention Leftheris. Dep. Tr. at 7.

**6.** The attorney who represented Doukas during the deposition was Steven Newburgh, Dep. Tr. at 2, who was admitted *pro hac vice* and who eventually withdrew from the representation of Doukas in this adversary proceeding and in Bavelis's underlying Chapter 11 case. Newburgh was only the first in a succession of attorneys who have represented Doukas in the adversary proceeding and bankruptcy case. Next was Gary Goldstein, who also was admitted *pro hac vice*, and whose admission the Court revoked because, among other things, Goldstein repeatedly filed documents that contained material omissions and false statements that he knew to be false and because he signed discovery responses on behalf of Quick Capital that were untruthful. Adv. Doc. 453 (order revoking Goldstein's admission *pro hac vice*). Goldstein was followed by attorneys from Vorys, Sater, Seymour and Pease LLP, including Richard Schuster and Tiffany Strelow Cobb. Doukas discharged Vorys and its attorneys after they were involved in the case for less than six months and did so on the eve of the hearing on the Show Cause Motions. Another attorney, Robert Gershman, then filed a motion for admission *pro hac vice* to represent Doukas. The Court entered an order denying that motion without prejudice to its refiling subject to certain conditions, *see* Adv. Doc. 430, but Gershman declined to pursue *pro hac vice* admission to represent Doukas, who then engaged the Vorys attorneys for the limited purpose of representing him in connection with the hearing on the Show Cause Motions. Finally, attorney Jerry Peer filed a notice of appearance for Doukas and his affiliated entities. Peer has since filed a motion to withdraw from the representation.

Assignment of Mortgage during his deposition gives the Court every reason to believe that he was involved in the post-Injunction decision to withhold those documents from Bavelis.

Doukas's pre-Injunction conduct is relevant for another reason. Doukas contends that, because the Injunction failed to specifically mention the O'Brien Property but referenced two other assets, the Injunction was not sufficiently specific and definite enough to prohibit Doukas's post-Injunction transfer of GMAQ's interests in the O'Brien Property. As will be seen, the reason the Injunction mentioned two specific properties is that Bavelis was aware that interests in them had already been transferred while, as a result of Doukas's non-disclosures, Bavelis was unaware that Doukas had already signed the Assignment of Mortgage as to the O'Brien Property. In any event, the language of the Injunction was sufficiently specific and definite enough to prohibit Doukas from making further transfers of GMAQ's assets.

## C. The Injunction

Bavelis filed the motion for a preliminary injunction in order to, as the Injunction states, preserve what he believed to be "the status quo pending a decision on the merits" of the adversary proceeding. Inj. ¶ 1. Thus, among other things, the Injunction prohibited the defendants, including Doukas, from "transferring, conveying, further encumbering, or otherwise disposing of any property, interest, and/or assets of … GMAQ … [FLOVEST, and two other limited liability companies] (the 'Companies')…." Inj. ¶ 1(a). That is, the Injunction contained a clear and specific order prohibiting Doukas from transferring "any property, interest, and/or assets of" GMAQ.

The Injunction also referenced the "Evergreen Elder Care Mortgage," which had

been transferred to BNK Real Estate, LLC ("BNK"), an entity affiliated with Qureshi. The Injunction provided that "BNK agrees that the asset it received by transfer from GMAQ, hereinafter referred to as the Evergreen Elder Care Mortgage, shall not be disposed of, transferred, or otherwise altered or encumbered without the mutual written agreement of [Bavelis] and the Qureshi Defendants." Inj. ¶ 2. Similarly, the Injunction provided that "Financial Lending Services [an entity affiliated with defendant Rab Masroor] agrees that the property that it received from [FLOVEST] by Quit Claim Deed, hereinafter referred to as the Ocean Drive Motel, shall not be transferred, encumbered, pledged, sold or otherwise disposed of without the mutual written agreement of the Parties." Inj. ¶ 3. As previously noted, the parties were able to include those provisions in the Injunction because, unlike the Assignment of Mortgage from GMAQ to Leftheris, Bavelis knew about the transfers to BNK and Financial Lending Services.

The Injunction also provided that "[t]he Parties agree to provide complete banking, loan and financial records of the Companies to each other within twenty (20) days so that the Parties can prepare their own accounting reports regarding the Companies" and that "[t]he Parties shall be permitted unfettered access to the books and records of the Companies and be entitled to copies of all documents and reports, including, without limitation, income statements, check registers, and financial statements, for the Companies[,]" including GMAQ and FLOVEST. Inj. ¶ 4. "Books and records" and "all documents" of GMAQ and FLOVEST certainly would include documents by which they purported to transfer their assets. The Injunction required that the Parties "be permitted" unfettered—i.e., unrestricted—access to

those "books and records" and "documents." Thus, the Injunction contained a clear and specific order prohibiting Doukas from obstructing Bavelis's access to any documents signed by Doukas purporting to transfer assets of GMAQ and FLOVEST, including the Quit Claim Deeds and the Assignment of Mortgage.

The Injunction was agreed to by Attorney Newburgh on behalf of Doukas as well as on behalf of Nemesis and other entities affiliated with Doukas. Doukas conceded that he had knowledge of the Injunction, including paragraphs one and four. Tr. at 46–48.

**D. Doukas's Failure to Permit Bavelis Unfettered Access to the Quit Claims Deeds and the Assignment of Mortgage in Violation of the Injunction**

Doukas possessed copies of the Quit Claim Deeds and the Assignment of Mortgage when the Injunction was issued. Tr. at 55. Yet Doukas did not provide the Quit Claim Deeds or the Assignment of Mortgage to Bavelis at any time until he filed the First Doukas Response on June 26, 2012, when he finally disclosed the existence of the Assignment of Mortgage in an effort to absolve himself of contempt—an effort that, as explained below, is unavailing. That is, Doukas failed to permit Bavelis "unfettered access" to the documents. In September 2011—after the Injunction was issued—Bavelis served Doukas with his second set of requests for production of documents on Doukas ("Second Document Request"). Bavelis Ex. 8. With the exception of documents that had already been produced—and Doukas had not produced the Quit Claim Deeds or the

Assignment of Mortgage, nor is there any evidence suggesting that Bavelis was aware of them at the time the Second Document Request was served—Bavelis requested that Doukas produce, among other documents:

38. [A]ll Documents sufficient to identify all real or personal property, cash, stock and/or other asserts [sic] transferred (as well as the value and timing thereof) by each of the Companies since December 1, 2009.[7]

39. [A]ll Documents sufficient to identify the recipient(s) (i.e., transferees) of any and all transfers of real or personal property, cash, stock and/or other assets by each of the Companies since December 1, 2009.

40. [A]ny agreements relating to any transfers of real or personal property, cash, stock and/or other assets by each of the Companies since December 1, 2009, and/or any agreements otherwise relating to assets transferred by each of the Companies since December 1, 2009.

Second Doc. Req. at 16–17.

In short, document requests number 38 and 39 required Doukas to produce all documents that would identify assets transferred since December 1, 2009 by FLOVEST and GMAQ, the date on which the transfers were made and the recipient of the transfers. The Quit Claim Deeds and the Assignment of Mortgage contained that information. Document request number 40 required Doukas to produce any agreements relating to a transfer of assets by FLOVEST and GMAQ since December 1, 2009–again requiring the production of the Quit Claim Deeds and the Assignment of Mortgage. Thus, anyone reading the Second Document Request clearly would have seen that the Quit Claim Deeds and

---

7. The term "Companies" again was defined to include FLOVEST and GMAQ. *See* Second Doc. Req. at 2 ("Those definitions set forth in [the First Document Request] are hereby in-

corporated by reference."); First Doc. Req. at 9 (defining "Companies" to include FLOVEST and GMAQ).

the Assignment of Mortgage were responsive. Yet Doukas failed to produce the Quit Claim Deeds and the Assignment of Mortgage or to point to their existence in the Florida real estate records. Instead, Doukas responded to document request numbers 38 and 39 with "See answer to interrogatory number 1," an answer stating that the interrogatory sought personal financial information and materials that were not relevant nor reasonably calculated to lead to the discovery of admissible evidence and that Doukas refused to provide any documents in response to the interrogatory. Doukas further stated in response to document request numbers 38 and 39 that "No further documents will be produced" and that there were "[n]o other relevant documents." Doukas responded to document request number 40 with the statement that there were "[n]o other relevant documents." [8]

Despite the Injunction's requirement that Doukas grant Bavelis unfettered access to the books and records of FLOVEST and GMAQ, Doukas failed to do so. Furthermore, in light of Doukas's testimony that Gary Goldstein—the attorney who responded to the Second Document Request on Doukas's behalf—never took any action that Doukas had not authorized, Doukas cannot blame Goldstein for the failure to turn over documents in response to document requests. Tr. at 57–58.

### E. Doukas's Request for the Original Promissory Note

On March 5, 2012, Goldstein sent Bavelis's counsel a letter requesting—as Gold-

stein had done "numerous times" before— the original promissory note secured by the Mortgage on the O'Brien Property.[9] First Doukas Resp. Ex. D. The letter stated that the "refusal of Mr. Bavelis to turn over the original documents post filing is causing damages to GMAC [sic] and the current members of GMAC [sic]" in that Goldstein had retained "Florida counsel, Juan Zorrilla[,] to secure final judgment of foreclosure against Noel Stephen O'Brien" and "Juan has been unable to secure the final judgment because the Judge is insisting on the production of the original promissory note." [10] First Doukas Resp. Ex. D. In the letter, Goldstein did not disclose the existence of the Assignment of Mortgage from GMAQ to Leftheris. If he had disclosed the existence of the Assignment of Mortgage, the obvious question the letter would have raised is how—if the Assignment of Mortgage had the effect Doukas claimed it had—the failure to turn over the original promissory note could possibly have caused harm to GMAQ.

### F. Documents Doukas Signed After the Court Issued the Injunction

On April 13, 2012, the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida ("State Court") entered a final judgment of foreclosure ("Foreclosure Judgment") in favor of GMAQ in an amount in excess of $2.3 million ("Judgment Amount"). The Foreclosure Judgment gave GMAQ a lien on the O'Brien Property for the Judgment

---

8. The first time Doukas made Bavelis or the Court aware of the Assignment of Mortgage was when he responded to the First Show Cause Motion. He attached the Assignment of Mortgage to the First Doukas Response and relied on it in that response, arguing that he could not be held in contempt because the Assignment of Mortgage took place before the Injunction was issued.

9. The Injunction required the production of *copies* of the books and records and documents of GMAQ, not *originals*.

10. In his letter, Goldstein obviously meant to refer to GMAQ rather than GMAC.

Amount. The Foreclosure Judgment also provided that the O'Brien Property would be sold at public sale if the Judgment Amount remained unpaid. Counsel for Leftheris was furnished a copy of the Foreclosure Judgment. Bavelis Ex. 23.

Because it was entered in favor of GMAQ and provided a lien to GMAQ on the O'Brien Property, the Foreclosure Judgment was an asset of GMAQ. As such, the Injunction prohibited Doukas from transferring it. Despite this, on June 18, 2012, Doukas signed a document in his purported capacity as the manager of GMAQ entitled "Assignment of Judgment and Right to Bid at Sale." The Assignment of Judgment and Right to Bid at Sale, which was recorded in the real estate records of Palm Beach County, Florida on June 18, 2012, purported to transfer GMAQ's interest in the Foreclosure Judgment, as well as GMAQ's right to bid at the sale of the O'Brien Property, to Leftheris. Bavelis Ex. 16.

GMAQ was the winning bidder at a sale occurring on February 1, 2013. Three days later, Doukas filed a document with the State Court entitled "Assignment of Bid[,]" again purporting to assign GMAQ's successful bid to Leftheris and requesting that the title for the O'Brien Property be in the name of Leftheris. Bavelis Ex. 21. On February 14, 2013, Qureshi signed a verified objection on behalf of GMAQ stating that the Assignment of Bid was a "fraud upon the [State] [C]ourt" and that the title to the O'Brien Property should only be in GMAQ's name. Bavelis Ex. 22.

### G. Doukas's Testimony During the Show Cause Hearing

During the Show Cause Hearing, Doukas gave testimony that raised serious questions as to his credibility. He testified that he could not recall whether Leftheris gave GMAQ any consideration for the Quit Claim Deeds or the Assignment of Mortgage in 2010, see Tr. at 53, or whether Leftheris gave GMAQ any consideration for the post-Injunction transfers he caused it to make to Leftheris in 2012 and 2013. Tr. at 72. The Court finds that a business person—except one lacking any long-term memory whatsoever—would recall whether one of his companies gave consideration for an asset with a value of approximately $2 million during the past several years. As was the case in his previous appearances as a witness before the Court, during the Show Cause Hearing Doukas exhibited the capacity to remember events occurring over the last several years when he believed it would cause him no harm, but suffered convenient memory lapses when he thought a lack of recall might benefit him.[11]

### VI. Legal Analysis

#### A. The Civil Contempt Standard

"[I]t is firmly established that [t]he power to punish for contempts is inherent in all courts." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (internal quotation marks omitted); *SkyPort Global Commc'ns*, 2013 WL 4046397, at *1 ("The

---

11. *See Bavelis I*, 490 B.R. at 293 n. 11 ("Over several days of cross-examination, Mr. Doukas exhibited a remarkable pattern of evasiveness. During his cross-examination, Mr. Doukas suffered one convenient memory lapse after another. Yet, when recounting facts that might support his version of events, his recollections were unclouded. Moreover, documents admitted into evidence that he prepared or that were prepared on his behalf—such as his tax returns and personal financial statement—were riddled with inconsistencies. In short, Mr. Doukas's trial testimony—as well as his out-of-court statements that were admitted as evidence—had a chameleon-like quality, shifting as necessary to suit his purposes at a given time.").

power to impose sanctions for contempt of an order is an inherent and well-settled power of all federal courts—including bankruptcy courts.... While the Court should use this power sparingly, the right to sanction those who flout this Court's authority is both necessary and integral to this Court's performance of its duties. Without this power, the Court would be a mere board[ ] of arbitration, whose judgments and decrees would be only advisory.") (citations and internal quotation marks omitted).

■ Like other courts, bankruptcy courts have the authority to award damages compensating injured parties for the civil contempt of another. *See, e.g., Liberis v. Craig*, No. 87–5321, 1988 WL 37450, at *8 (6th Cir. Apr. 25, 1988) ("Courts have, and must have, the inherent authority to enforce their judicial orders and decrees in cases of civil contempt.... [T]here is no question that the bankruptcy court had the authority to award attorneys' fees against the plaintiffs to compensate the trustee for bringing plaintiffs' contempt to the court's attention."); *see also McMahan & Co. v. Po Folks, Inc.*, 206 F.3d 627, 634 (6th Cir.2000) ("We have previously recognized that an award of attorney's fees is appropriate for civil contempt in situations where court orders have been violated.").

■ "A contempt fine ... is considered civil and remedial if it either coerce[s] the defendant into compliance with the court's order, [or] ... compensate[s] the complainant for losses sustained." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 829, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) (internal quotation marks omitted); *see also In re Hake*, No. 06–8014, 2006 WL 2846277, at *2 (6th Cir. BAP Oct. 3, 2006) ("A contempt fine is civil if it either coerces one into compliance with a court order or compensates for a loss sustained."). Any damages the Court awards would be designed to compensate Bavelis's estate for losses it sustained (including for attorneys' fees and expenses incurred) as a result of Doukas's contemptuous conduct. Thus, any fine imposed against Doukas would be civil in nature.

■ "[B]efore a finding of contempt may be entered, a party must have willfully violated a specific provision of a court order." *Williamson v. Recovery Ltd. P'ship*, 467 Fed.Appx. 382, 388 (6th Cir. 2012). Disobedience of a court order warrants a finding of civil contempt only if the order is "clear and unambiguous[,]" with "[a]mbiguities ... resolved in favor of the party charged with contempt." *Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 550–51 (6th Cir.2006) (citations and internal quotation marks omitted). In order to obtain an order of civil contempt, Bavelis must carry the "burden of proving by clear and convincing evidence" that Doukas "violated a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Id.* As explained below, the evidence is clear and convincing that Doukas had knowledge of the Injunction and that the Injunction unambiguously prohibited his subsequent misconduct.

## B. Doukas's Contempt of Court

Doukas conceded that he had knowledge of the Injunction. Furthermore, through counsel, he agreed to its provisions. His acquiescence, though, turned out to be illusory, for he disregarded the Injunction when he found it expedient to do so. But he had no right to resist the Injunction on those occasions. The only proper way for Doukas to protest the Injunction would have been to object to its issuance, and, if the Court had entered it over his objection, to seek his "remedy ... on appeal."

*United States v. Moncier,* 571 F.3d 593, 599 (6th Cir.2009). Failing that, "[t]here is no right of revolution" in the courts, and it is a party's "duty ... not to defy the judge's orders, but to follow them." *Id.* Yet Doukas brazenly defied the Injunction. In fact, he disobeyed the requirements imposed by two paragraphs of the Injunction. Not only that, he disobeyed the commands set forth in those paragraphs twice.

First came Doukas's violations of the Injunction's fourth paragraph, which required that Bavelis be "permitted unfettered access to the books and records of [GMAQ and FLOVEST] and ... to copies of all documents and reports, including, without limitation, income statements, check registers, and financial statements, for [GMAQ and FLOVEST]." Inj. ¶ 4. A company's books and records and its documents include the written records of its business transactions, such as documents by which it purports to transfer its interests in property. GMAQ's books and records therefore included copies of the Quit Claim Deeds and the Assignment of Mortgage. Bavelis accordingly was to be permitted unfettered access to those documents and was entitled to copies of them. Yet when Bavelis—after the issuance of the Injunction—propounded a request for production of documents that required Doukas to produce the Quit Claim Deeds and the Assignment of Mortgage (or at the very least a response stating that the documents were publicly available) Doukas declined to produce the documents and said that *no relevant documents existed.* That is, Doukas obstructed Bavelis's access to the Quit Claim Deeds and the Assignment of Mortgage rather than granting him unfettered access to them.

Moreover, Goldstein sent Bavelis's counsel a letter that requested the original promissory note secured by the Mortgage on the O'Brien Property but failed to inform Bavelis's counsel that Doukas had already signed and filed the Assignment of Mortgage from GMAQ to Leftheris. Goldstein also stated that the refusal to turn over the original promissory note would cause harm to GMAQ. The only fair reading of that letter is that GMAQ still had a financial interest in the Mortgage. Therefore, that letter—which by Doukas's own admission he authorized, because, as he testified, Goldstein never took any action that Doukas did not authorize—also served to obstruct Bavelis's access to the Assignment of Mortgage.

Next came Doukas's dual violations of the Injunction's prohibition against "transferring, conveying, further encumbering, or otherwise disposing of any property, interest, and/or assets of" GMAQ. Inj. ¶ 1(a). After the Injunction was issued, Doukas signed the Assignment of Judgment and Right to Bid at Sale, a document purporting to transfer a judgment in an amount in excess of $2.3 million and a lien on the O'Brien Property, as well as the right to bid at the sale of the O'Brien Property, from GMAQ to Leftheris. Then, after GMAQ was the winning bidder at the foreclosure sale, Doukas filed a document with the State Court purporting to assign GMAQ's successful bid to Leftheris and requesting that the title to the O'Brien Property be issued only in the name of Leftheris. In other words, after the Injunction was issued, Doukas twice attempted to transfer GMAQ's assets to Leftheris.

### C. Doukas's Unmeritorious Defenses

Doukas attempts to justify his actions by making six arguments, none remotely persuasive. His first argument is that assigning the Mortgage to Leftheris *before* the Injunction was in place made the Mortgage an asset of Leftheris, not an asset of GMAQ subject to the Injunction, and that it therefore was impossible for him to have

violated the Injunction when he assigned the Foreclosure Judgment to Leftheris *after* the Injunction was issued. First Doukas Resp. at 4; Second Doukas Resp. at 2. Put differently, the assignment of the Foreclosure Judgment to Leftheris was merely a ministerial act that could not have violated the Injunction—or so says Doukas—because the Assignment of Mortgage made Leftheris the real party in interest entitled to the Foreclosure Judgment. Tr. at 13–14, 138–39, 141–42. Regardless of Leftheris's status at that point, the argument runs headlong into what the State Court actually did when it entered the Foreclosure Judgment, which was enter a judgment *in favor of GMAQ* and grant a lien on the O'Brien Property for the Judgment Amount *to GMAQ*. As a result, the Foreclosure Judgment and the lien on the O'Brien Property were GMAQ's assets, and Doukas's attempts to assign them to Leftheris violated the Injunction. Doukas's argument to the contrary ignores the reality of the Foreclosure Judgment.[12]

Doukas's second argument is that the Injunction does not prohibit the transfer of GMAQ's interests in the O'Brien Property. To the contrary, the Injunction was sufficiently specific enough to prohibit Doukas from transferring the Foreclosure Judgment and right to bid at foreclosure from GMAQ to Leftheris. After all, the Injunction prohibited Doukas from "transferring, conveying, further encumbering, or otherwise disposing of *any property, interest, and/or assets of* [GMAQ]." Inj. ¶ 1(a). While the Sixth Circuit has stated that "milieu limits the reach of general words" such as the words "all" or "any," *Russell v.*

*Citigroup, Inc.,* 748 F.3d 677, 681 (6th Cir.2014), there is absolutely nothing in the Injunction remotely suggesting that the phrase *any property interest, and/or assets* should be limited in the way Doukas suggests. He notes that the Injunction failed to mention the O'Brien Property while referencing two other properties, including the property subject to the Evergreen Elder Care Mortgage, the mortgage that was transferred to BNK, and finds in this difference evidence that the Injunction did not cover the Mortgage on the O'Brien Property. Tr. at 14–16.

Under Doukas's odd interpretation of the Injunction, the only GMAQ asset that any of the parties are prohibited from transferring is the one that had already been transferred to BNK, an affiliate of Qureshi. In other words, according to Doukas, even though the Injunction says that it prohibits the transfer of *any* property, interest and/or assets of GMAQ, what it actually means is that there are *no assets of GMAQ* that Doukas is prohibited from transferring. That is an absurd reading of the Injunction. And it becomes all the more absurd (if that is possible) when one considers that the reason the Injunction specifically mentioned the Evergreen Elder Care Mortgage was because Bavelis was aware of the transfer of that mortgage to BNK. By contrast, because Doukas lied in a deposition and failed to produce (in response to the First Document Request) the Quit Claim Deeds and the Assignment of Mortgage, Bavelis did not know about the purported transfer of the Mortgage on the O'Brien Property to Leftheris at the time the parties agreed to the Injunction.[13]

---

12. Bavelis is not the only one to take issue with Doukas's actions in the State Court. As noted above, Qureshi signed a verified objection on behalf of GMAQ stating that the Assignment of Bid was a fraud upon the State Court and that the title should be issued only to GMAQ.

13. The Court is not holding Doukas in contempt for violating the Scheduling Order.

Doukas's third argument is that he gave all the documents in his possession that were responsive to the Second Document Request to his former attorney. Tr. at 135. A litigant "should not be punished for his attorney's mistake absent a clear record of ... wilful contempt or contumacious conduct." *McGuire v. Mich. Dep't of Community Health,* 526 Fed.Appx. 494, 497 n. 2 (6th Cir.2013). But here the record is clear that Doukas must have been involved in the decision not to provide, and failure to permit unfettered access to, the Quit Claim Deeds and the Assignment of Mortgage. In light of Doukas's deceit during his pre-Injunction deposition, it strains credulity to believe that he shared no blame for (1) the post-Injunction failure to provide the Quit Claim Deeds and the Assignment of Mortgage in response to the Second Document Request and (2) the post-Injunction decision to not mention the Assignment of Mortgage in Goldstein's letter requesting the original copy of the promissory note secured by the Mortgage. Despite the Injunction's requirement that Doukas provide Bavelis with unfettered access to the books and records of FLOVEST and GMAQ, Doukas's misconduct instead had the effect of blocking Bavelis's access to the information and documents in question.

Doukas's fourth argument is that he did not violate the Injunction as to the Quit Claim Deeds and the Assignment of Mort-gage because he filed those documents in the public record. Tr. at 135–37, 141. True, Doukas filed the documents in the real estate records, but he failed to permit Bavelis the unfettered access to them the Injunction required. The argument that Bavelis's access was unfettered because he would have found them if he had searched the public records does not absolve Doukas of liability for obstructing Bavelis's access to the documents. Doukas asserts that his filing of the Quit Claim Deeds and the Assignment of the Mortgage in the public record negates any suggestion that he intended to hide the ball. That argument might hold water if Doukas did not attempt to conceal the existence of these documents through his false and misleading responses to the Second Document Request. It is one thing to defend against a claim of wrongful nondisclosure by arguing that your opponent, by making a thorough public records search, could have found the needle in the haystack; it is quite another to lie about the existence of the needle.[14]

Doukas's fifth argument is that the Quit Claim Deeds and the Assignment of Mortgage are not the type of records covered by a reasonable interpretation of paragraph 4 of the Injunction because the Injunction required the provision of "complete banking, loan and financial records of the Companies" so that "the Parties can

---

That order provided only that Doukas and the other defendants "shall produce their responses and objections to [the First Document Request], including all documents produced in response thereto, so that they are received in the offices of [Bavelis's] counsel by 10:00 a.m. on Friday, December 3, 2010." Technically speaking, he complied with that order when he responded by December 3, 2010.

**14.** Doukas's argument that the public filing of the Quit Claim Deeds and the Assignment of Mortgage absolves him of liability for contempt because the filing provides constructive notice of Leftheris's purported property interests, Tr. at 135, fares no better. Constructive notice is a relevant concept in the context of deciding whether a transfer of an interest in real property can be avoided by a subsequent bona fide purchaser. The concept, though, is entirely irrelevant to the issue of whether a party who has misled another party about the existence of documents—which is what Doukas did here—has violated a court order that required him to grant unfettered access to the documents.

prepare their own accounting reports regarding the Companies." Tr. at 137 (Doukas's attorney stating that "[t]he reasonable explanation [for the failure to disclose the Quit Claim Deeds and the Assignment of Mortgage] is these aren't the type of financial records that are talked about in paragraph 4 where it says complete banking, loan and financial records. Why? Because they were preparing financial reports."). But the Injunction also required Doukas to permit Bavelis unfettered access to "the books and records of the Companies and . . . copies of all documents and reports[,]" Inj. ¶ 4, which certainly includes the Quit Claim Deeds and the Assignment of Mortgage.

Doukas's sixth argument is that the Court does not have jurisdiction to unwind the transfer that Doukas (through Nemesis) made to Leftheris of GMAQ's interest in the O'Brien Property and that the Court therefore should not hold Doukas in contempt for making the transfer to Leftheris. Tr. at 121–25. But as counsel to Doukas acknowledged, Tr. at 123, the Court has related-to jurisdiction to unwind the transfer if doing so would have a conceivable effect on the administration of Bavelis's bankruptcy estate. *See Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1142 (6th Cir.1991) ("The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.*"); *Meritage Homes Corp. v. JPMorgan Chase Bank, N.A.*, 474 B.R. 526, 557–69 (Bankr.S.D.Ohio 2012) (discussing the conceivable-effect test for determining the existence of related-to jurisdiction).

Among other things, given that a bankruptcy estate is comprised of property, a proceeding could conceivably have an effect on a bankruptcy estate if the outcome of the proceeding could potentially result in an increase in the value of the estate's property. *Id.* at 559. There is such a conceivable effect here. Bavelis is seeking to recover his membership interest in GMAQ. And under Bavelis's proposed fifth amended plan of reorganization ("Plan") (Doc. 712) funds to which Bavelis becomes entitled as a result of that membership interest could be available for distribution to creditors. *See* Plan at 8 (defining "Net Distributive Liquidation Proceeds" as "any consideration received by the Debtor following the Effective Date on account of his ownership interest in an entity arising from the sale or refinancing of the principal asset(s) of any such entity, which interest is not otherwise subject to the lien of the holder of an Allowed Secured Claim hereunder, less all costs, expenses and applicable tax obligations incurred by or on behalf of the Debtor in realizing such consideration") and Plan at 22 (providing that certain Net Distributive Liquidation Proceeds may be deposited into an account used to make distributions to unsecured creditors). Thus, like his others, Doukas's sixth and final argument is without merit.

### VII. Conclusion

■ For the foregoing reasons, the Court concludes that Bavelis has carried his burden of proving by clear and convincing evidence that Doukas committed civil contempt when, after the issuance of the Injunction, he: (a) failed to provide Bavelis with unfettered access to the Quit Claim Deeds and the Assignment of Mortgage; and (b) transferred the Foreclosure Judgment entered in favor of GMAQ and its right to bid on the O'Brien Property from GMAQ to Leftheris.

Bavelis requests that the Court award him reasonable attorneys fees and costs associated with prosecuting the Show Cause Motions. Bavelis shall file a state-

ment of fees and expenses ("Fee Statement") no later than **October 10, 2014.** Doukas shall have until **October 24, 2014** to file an objection to the Fee Statement. Any objection must state with particularity why any fees charged or expenses set forth in the Fee Statement are unreasonable or otherwise are not properly recoverable by Bavelis as damages caused by Doukas's contemptuous conduct. If an objection is filed, a hearing on damages will be scheduled by separate order.

**IT IS SO ORDERED.**