IN RE : George A. BAVELIS, Debtor.

George A. Bavelis, Plaintiff,

v.

**Ted Doukas, et al., Defendants.:**

Case No. 10–58583
Adv. Pro. No. 10–2508

United States Bankruptcy Court,
S.D. Ohio, Eastern Division,
**at Columbus.**

Signed July 31, 2015

Marion H. Little, Jr, Michael N. Schaeffer, Richard K. Stovall, Zeiger, Tigges & Little, LLP, Columbus, OH, for Debtor.

*MEMORANDUM OPINION AND ORDER AWARDING GEORGE A. BAVELIS ATTORNEYS' FEES AND EXPENSES INCURRED AS A RESULT OF TED DOUKAS'S CIVIL CONTEMPT*

John E. Hoffman, Jr., United State Bankruptcy Judge

## I. Introduction

After the Court held Ted Doukas ("Doukas") in civil contempt, the Chapter 11 debtor, George A. Bavelis ("Bavelis"), requested an award of the reasonable attorneys' fees and expenses he incurred as a result of Doukas's contemptuous conduct. For the reasons explained below, the Court awards Bavelis fees and expenses in the amount of $62,411.56 and orders Dou-

kas to pay that amount to Bavelis immediately.

## II. Jurisdiction and Constitutional Authority

The Court has jurisdiction to hear and determine this contested matter pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(A) and (O).

The Court also has the constitutional authority to enter a final order awarding professional fees and expenses incurred as a result of contemptuous conduct. *See In re Brown,* 511 B.R. 843, 848 (Bankr. S.D.Tex.2014) (holding that bankruptcy courts have the constitutional authority to impose sanctions for contempt after *Stern v. Marshall,* — U.S. —, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011)); *In re Green,* No. 12–13410, 2014 WL 1089843, at *1 (Bankr. N.D.Ohio Mar. 19, 2014) (same); *Schermerhorn v. Centurytel, Inc. (In re Skyport Global Commc'ns),* No. 08–36737–H4–11, 2013 WL 4046397, at *41 (Bankr.S.D.Tex. Aug. 7, 2013) (same).

## III. Procedural Background

Following an evidentiary hearing (the "Contempt Hearing"), the Court entered an opinion and order holding Doukas in civil contempt. *See Bavelis v. Doukas (In re Bavelis),* 519 B.R. 707 (Bankr.S.D.Ohio 2014) (the *"Contempt Opinion"*). The Court also established procedures for determining the amount of attorneys' fees and expenses that Bavelis incurred and may recover as a result of the contempt. *See id.* at 722–23. In accordance with those procedures, Bavelis filed a statement in which he requested fees and expenses incurred as a result of Doukas's contempt (the "Fee Request") (Adv.Doc. 523).[1]

1. References to documents filed in Bavelis's bankruptcy case, Case No. 10–58583, will be designated as "Doc. —," and references to documents filed in this adversary proceeding, Adversary Proceeding No. 10–2508, will be designated as "Adv. Doc. —."

Through an attorney whose motion for admission *pro hac vice* the Court later denied, *see* Adv. Doc. 541, Doukas filed an objection to the Fee Request (the "Doukas Objection") (Adv.Doc. 539).

On March 18, 2015, Doukas, who was then appearing *pro se,* represented to the Court that he would be available for a hearing on the Fee Request and the Doukas Objection on May 4, 2015, and the Court entered an order scheduling the hearing for that date. Adv. Doc. 591. But later, on March 23, 2015, Doukas, claiming to be unable to travel to Columbus for a hearing on May 4, 2015, sent a letter to the Court requesting that the hearing be rescheduled. Adv. Doc. 623 (letter redacted to preserve confidentiality). As a result, the Court entered an order rescheduling the hearing for June 22, 2015—a date on which Doukas represented in his letter that he would be available. Adv. Doc. 599. On April 20, 2015, Franklin Davis ("Davis") entered a notice of appearance on behalf of Doukas.[2] Adv. Doc. 603.

On June 22, 2015, the Court held the hearing on the Fee Request (the "Fee Hearing"). Despite the fact that the hearing had been rescheduled so that Doukas could attend it personally, he failed to do so. Instead, he appeared only through Davis and another attorney from Davis's firm. Thus, even if Doukas truly was unavailable on the date originally scheduled for the Fee Hearing, the reason he gave for why he needed the hearing to be rescheduled appears to have been spurious.

During the Fee Hearing, the Court heard the testimony of Richard Stovall ("Stovall"), Christopher Hogan ("Hogan") and Larry McClatchey ("McClatchey"), all on behalf of Bavelis. Stovall testified in support of the fees charged by Bavelis's bankruptcy counsel, Allen Kuehnle Stovall & Neuman LLP ("AKSN"), while Hogan testified in support of the fees and expenses charged by Bavelis's special litigation counsel, Zeiger, Tigges & Little LLP ("ZTL"). McClatchey provided expert testimony in support of both. In addition, Bavelis Exhibits 5 through 9 were admitted into evidence without objection. Invoices reflecting the time spent by Bavelis's professionals in connection with this matter (the "Invoices") were admitted into evidence as Bavelis Exhibits 5(ZTL) and 6 (AKSN), while Bavelis Exhibits 7 and 8 provided summaries of the Invoices, and Bavelis Exhibit 9 set forth a "Timeline of Billing Matters Related to Doukas' Contempt" (the "Timeline").

Doukas presented no evidence during the Fee Hearing.

## IV. Findings of Fact

In this opinion, the Court uses the defined terms contained in the Contempt Opinion and incorporates its findings of fact by reference. Among other things, the Court found in the Contempt Opinion that Doukas violated the Court's Injunction and therefore was in civil contempt when he failed to provide Bavelis unfettered access to certain documents in the books and records of GMAQ (the Assignment of Mortgage) and FLOVEST (the Quit Claim Deeds). *See Contempt Op.,* 519 B.R. at 715–16. In addition, the Court found that Doukas engaged in contemptuous conduct when he purported to transfer property of GMAQ, a limited liability company in which Bavelis asserted an interest, to one of Doukas's own companies, Leftheris. The GMAQ property that Doukás purported to transfer included a Foreclo-

---

2. Davis is the most recent in a series of attorneys who have either represented Doukas or filed motions for admission *pro hac vice* to represent him. *See Contempt Op.,* 519 B.R. at 713 n. 6 (identifying the attorneys who have represented Doukas, or who have sought admission *pro hac vice* to represent him, in this adversary proceeding).

sure Judgment exceeding $2.3 million, the right to bid at the foreclosure sale and the successful bid. *See id.* at 716–17. Based on the evidence adduced during the Fee Hearing and the Contempt Hearing, including the documentary evidence and the testimony presented, the Court makes the following additional findings of fact.

## A. Total Fees and Expenses Requested

After the Fee Request was filed, Hogan discovered that ZTL had mistakenly included in the Invoices two time entries relating to matters other than Doukas's contempt, Hearing Transcript ("Tr.") (Adv. Doc. 621) at 14–17, requiring the amount of fees and expenses requested for the time periods covered by the Invoices to be reduced from $51,466.06 to $50,131.56.[3] Tr. at 18. In addition to the $50,131.56 amount, Bavelis seeks to recover $3,600 for the time his counsel spent preparing for the Fee Hearing up through June 9, 2015, Tr. at 5, 18–19; an additional $2,280 for time counsel spent preparing for the hearing after June 9, 2015, Tr. at 19; and $6,400 in expenses for McClatchey's expert witness fees. Tr. at 36–37. Thus, the total amount of fees and expenses Bavelis seeks to recover as a result of Doukas's contempt is $62,411.56.

## B. Fees

Bavelis may recover the fees set forth in the Invoices to the extent that (1) the hourly rates of the professionals who represented him in this matter are reasonable and (2) the time spent was both reasonable and expended as a result of Doukas's contempt.

## 1. Hourly Rates

Each professional who represented Bavelis in connection with this contempt matter is affiliated either with ZTL or AKSN. Those professionals, primarily ZTL partners Marion Little and Hogan and AKSN partner Stovall, are identified in the Invoices together with their hourly rates— $290 for Stovall, $270 or less for Hogan depending on the date of the service and $435 for Little.

During the Fee Hearing, Bavelis presented the testimony of McClatchey, a partner in the Columbus, Ohio office of Kegler, Brown, Hill & Ritter ("KBHR"). McClatchey has been licensed to practice law since 1975 and has been a Chapter 7 panel trustee since 1988. In his capacity as Chapter 7 trustee, he routinely retains KBHR as bankruptcy counsel and sometimes retains other firms as special counsel. As a result of his work as trustee, as well as his experience in connection with KBHR's periodic review of local billing rates, McClatchey has become familiar with the rates that are reasonable and customary in Columbus. Tr. at 30–33. Based on McClatchey's extensive experience and his review of this contempt matter, he concluded that the rates set forth in the Invoices are reasonable and customary for similarly situated professionals in bankruptcy litigation in the Columbus area. Tr. at 33–35. Relying on this testimony as well as its own knowledge and experience, the Court concludes that the hourly rates set forth in the Invoices are consistent with the "prevailing market rate," that is, the rate that professionals of "comparable skill and experience could reasonably expect to command" in this Court.[4]

---

**3.** The $50,131.56 amount is comprised of $48,051.25 of fees charged by both firms ($42,860.25 for ZTL and $5,191 for AKSN) and $2,080.31 of expenses billed by ZTL. Tr. at 18.

**4.** *Waldo v. Consumers Energy Co.,* 726 F.3d 802, 821 (6th Cir.2013) (internal quotation marks omitted).

### 2. Time Spent

Hogan and Stovall represented that the services described in the Invoices for which fees are being requested from Doukas were performed as a result of his contempt. Tr. at 7–17, 25–28. The Court, though, must independently review the Invoices to determine that the services performed were undertaken as a result of Doukas's contempt and that the time spent was reasonable and necessary. *See Smith v. Serv. Master Corp.*, 592 Fed.Appx. 363, 367 (6th Cir.2014).

The Court's line-by-line review of the Invoices confirms Hogan's and Stovall's representations that ZTL's and AKSN's services were performed as a result of Doukas's contempt. As described below, in addition to preparing for the Contempt Hearing and the Fee Hearing, Bavelis's professionals performed services falling into three primary categories. Bavelis Ex. 8, Timeline.

*First,* his attorneys undertook efforts to address Doukas's failure to comply with the Injunction's requirement that he provide Bavelis with unfettered access to the books and records of GMAQ and FLOVEST. Tr. at 10–11; Timeline; Ex. 8 (identifying total fees in this category of $8,283.50). Although Bavelis propounded discovery requests before the Injunction was issued, the Invoices do not include time spent by his attorneys in connection with this pre-injunction discovery, and rightly so. By way of background, though, it bears noting that, on December 1, 2010, Doukas and certain of his affiliated entities (the "Doukas Defendants") produced nearly a thousand pages of documents in response to the discovery requests that Bavelis made before the Injunction was issued. *See* Contempt Hearing Ex. 5 (Feb. 24, 2011 letter from Little to Doukas's counsel). Doukas, however, did not include the Quit Claim Deeds or the Assignment of Mortgage among the documents he produced. *See Contempt Op.,* 519 B.R. at 712–14.

The Injunction, which was issued on December 15, 2010, required Doukas to provide Bavelis with unfettered access to *all* of the books and records of GMAQ and FLOVEST, including the Quit Claim Deeds and the Assignment of Mortgage. Doukas, though, failed to do so. Instead, on January 6, 2011, Steven Newburgh ("Newburgh"), who was the first attorney to represent Doukas in this adversary proceeding and who was still representing him at that time, filed a motion for an extension through January 28, 2011 to provide the documents that the Injunction required Doukas to produce. *See* Adv. Doc. 87. To Little, the filing of that motion hinted at the existence of documents that were covered by the Injunction, but that Doukas had not produced in response to the pre-injunction discovery. *See* Contempt Hearing Ex. 7 (Feb. 25, 2011 letter from Little asking why Newburgh would have sought an extension of time to comply with the Injunction if Doukas in fact did not have documents that the Injunction required him to produce). That motion was the last document Newburgh filed on behalf of Doukas, other than a motion— filed at Doukas's request—to withdraw as counsel.[6]

After Newburgh filed the motion for an extension of time to comply with the Injunction, Gary A. Goldstein ("Goldstein") took over the representation of Doukas. Thus, when the extension requested in the motion filed by Newburgh expired without

---

6. On March 3, 2011, Newburgh filed a motion to withdraw as attorney for Doukas and the other Doukas Defendants, stating that they "have retained replacement counsel and have requested that undersigned formally withdraw of record." Doc. 194 at 1.

additional documents being turned over, Little sent a letter to Goldstein via e-mail requesting that Doukas comply with the Injunction. *See* Contempt Hearing Ex. 5 (Feb. 24, 2011 letter from Little to Goldstein). That same day, Goldstein replied by e-mail, stating that the "change of counsel may have caused some delay or confusion in what discovery had already been produced[,]" suggesting that Doukas had produced all of the documents covered by the Injunction. Contempt Hearing Ex. 6 (Feb. 24, 2011 email from Goldstein to Little). The next day, Little sent Goldstein a follow-up letter asking him why Newburgh had filed a motion requesting an extension of time to comply with the Injunction if Doukas had already provided all of the documents that were within its purview. Contempt Hearing Ex. 7 (Feb. 25, 2011 letter from Little to Goldstein). Of course, if Doukas had obeyed the Injunction, Little would not have needed to send the February 2011 letters.

Despite Little's correspondence with Goldstein, Doukas still did not provide the Assignment of Mortgage or the Quit Claim Deeds to Bavelis, but instead continued to obstruct his unfettered access to those documents, requiring Bavelis's attorneys to perform certain other services after February 2011, including making additional document requests of Doukas and deposing Goldstein. In calculating the fees relating to Goldstein's deposition, Bavelis's counsel properly allocated the time to ensure that the fees Bavelis was seeking to charge to Doukas were the result of his contempt rather than other potentially

sanctionable conduct on the part of Doukas and Goldstein that will be the subject of a later proceeding in this Court. Tr. at 12.[7] Indeed, whenever a block of time related both to Doukas's contempt as well as other matters, the Invoices were adjusted to allot the appropriate time to the tasks related to Doukas's contemptuous conduct. Tr. at 9–10. Accordingly, Bavelis requests fees only for time—including all of the time described above—that was expended as a result of Doukas's contemptuous conduct.

*Second,* in June and July 2012, after conducting an inquiry relating to Doukas's execution of the Assignment of Judgment and Right to Bid at Sale, Bavelis's professionals prepared the First Show Cause Motion. When Doukas opposed that motion, they also prepared a reply brief addressing Doukas's opposition. Tr. at 11–13, 25–26; Timeline; Ex. 8 (identifying total fees in this category of $16,703.25).

*Third,* in February and March 2013, after conducting the inquiry necessary to file a contempt motion with respect to Doukas's execution of the Assignment of Bid from GMAQ to Leftheris, Bavelis's counsel prepared the Second Show Cause Motion. They also prepared a reply brief addressing Doukas's objection to that motion and undertook efforts to obtain an agreed order effectuating the reassignment of the bid back to GMAQ. Tr. at 11–13; Timeline; Ex. 8 (noting total fees in this category of $23,064.50). Finally, Bavelis's attorneys spent time preparing for the Contempt Hearing and the Fee Hearing. Tr. at 5, 18–19 (noting total fees for hearing prepa-

---

7. Bavelis filed a motion for a show cause order ("Sanctions Motion") based on Doukas's and Goldstein's conduct with respect to one of the other Doukas Defendants, Quick Capital of LI Corp. ("Quick Capital"), *see* Adv. Doc. 348, and the Court issued a show cause order against Doukas, Quick Capital and Goldstein that is to be heard on September

16, 2015. *See* Adv. Docs. 604, 606. The facts that would form the basis for any judgment against Doukas vis-a-vis his conduct relating to Quick Capital, as well as his conduct that is described in Bavelis's Amended Complaint (Adv.Doc. 490), are separate and distinct from the facts supporting the issuance of the Contempt Opinion.

ration of $5,880). All of the services described above were performed as a result of Doukas's contempt.

McClatchey testified that the amount of time spent in providing these services was reasonable and necessary. Tr. at 35–36. The Court's independent review confirms this to be the case, and Doukas presented no evidence to the contrary. In total, the Court find that fees in the amount of $53,931.25 ($8,283.50 + $16,703.25 + $23,064.50 + $5,880) were reasonably and necessarily incurred as a result of Doukas's contempt.

## C. Expenses

Bavelis seeks $2,080.31 of expenses incurred by ZTL and $6,400 of expenses for McClatchey's expert witness fees, for total expenses of $8,480.31. Ex. 8, Tr. at 16–17, 36–37. These expenses were reasonable and necessary and were incurred as a result of Doukas's contempt.

## V. Legal Analysis

### A. Fees and Expenses as Compensation for Contemptuous Conduct

"[I]t is firmly established that [t]he power to punish for contempts is inherent in all courts." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (internal quotation marks omitted). Like other courts, bankruptcy courts have the authority to award damages in order to compensate injured parties for the civil contempt of another party. *See, e.g., Liberis v. Craig*, No. 87–5321, 1988 WL 37450, at *8 (6th Cir. Apr. 25, 1988) ("[T]here is no question that the bankruptcy court had the authority to award attorneys' fees against the plaintiffs to compensate the trustee for bringing plaintiffs' contempt to the court's attention.").

A "[trial] court ha[s] broad discretion to fashion an appropriate remedy for ... contempt[,]" and "[i]n a civil contempt proceeding, judicial sanctions can be used not only to coerce compliance, but also to compensate the complainant." *Williamson v. Recovery Ltd. P'ship*, 467 Fed. Appx. 382, 396 (6th Cir.2012) (internal quotation marks omitted). In order to recover fees and expenses as compensation for contemptuous conduct, a party must demonstrate that the fees and expenses were incurred as a result of the contempt. *See Ross v. Meyers*, 883 F.2d 486, 491 (6th Cir.1989) ("A compensatory sanction [for contempt of court] must be based upon ... actual losses sustained as a result of the contumacy.") (internal quotation marks omitted); *Liberis v. Craig*, No. 87–5321, 1988 WL 37450, at *8 (6th Cir. Apr. 25, 1988) ("[T]he costs associated with these appeals were a direct result of the plaintiffs' initial contumacious conduct.... Therefore, we find that the bankruptcy judge did not abuse his discretion by awarding attorneys' fees and expenses incurred by the trustees as a result of the plaintiffs' unsuccessful appeals of the orders holding them in contempt.").

There is a split of authority on the issue of whether courts must use the lodestar method—under which they calculate the recoverable fee based on "the number of hours reasonably expended multiplied by a reasonable hourly rate"— when evaluating a request for fees in the context of civil contempt. *Walman Optical Co. v. Quest Optical, Inc.*, No. 11–CV–0096, 2012 WL 3248150, at *11 (D.Minn. Aug. 9, 2012) (citing cases on both sides of the issue while following the lodestar method). Although the Bankruptcy Appellate Panel of the Sixth Circuit has held that courts need not use the lodestar method in the contempt context, it did not hold that courts are prohibited from doing so when evaluating fees incurred as a re-

sult of another party's contempt.[8] And the United States District Court for the Southern District of Ohio has used the lodestar method in the context of civil contempt. *See Dominic's Rest. of Dayton, Inc. v. Mantia,* No. 3:09–cv–131, 2009 WL 4680223, at *6 (S.D.Ohio Dec. 3, 2009). Thus, the Court employed the lodestar method in making its findings of fact set forth above. Under this approach to calculating fees, the party seeking compensation "bears the burden of proving that the number of hours expended was reasonable[.]" *Gunasekera v. Irwin,* 774 F.Supp.2d 882, 887 (S.D.Ohio 2011). Bavelis has carried this burden with respect to the fees he seeks to recover from Doukas. In fact, "[t]he documentation offered in support of the hours charged [is] of sufficient detail and probative value to enable the [Court] to determine with a high degree of certainty that such hours were actually and reasonably expended[.]" *Imwalle v. Reliance Med. Prods., Inc.,* 515 F.3d 531, 553 (6th Cir.2008) (internal quotation marks omitted).

■ Based on its findings in this opinion and in the Contempt Opinion, the Court concludes that the lodestar amount is $53,931.25 of fees plus $8,480.31 of expenses, for a total award to Bavelis of $62,411.56. Once "the party seeking the attorney fees has established that the number of hours and the rate claimed are reasonable, the lodestar is presumed to be the reasonable fee to which counsel is entitled." *Id.* at 552. Here, there is no reason to conclude that the $62,411.56 award calculated under the lodestar method is anything other than reasonable given the factual findings outlined above and in the Contempt Opinion. And, as explained below, the arguments asserted in the Doukas

Objection are utterly meritless and provide no basis for the Court to depart from the lodestar amount.

## B. The Doukas Objection

■ "Where a party raises specific objections to a fee award, a [trial] court should state why it is rejecting them." *Serv. Master,* 592 Fed.Appx. at 367. The Court will do so below.

### 1. Alleged Compliance with the Show Cause Motions

■ In his written objection, Doukas represents that "after being served with each motion for contempt [he] immediately complied with the relief requested." Doukas Objection at 8. This statement is simply not true. The relief requested by Bavelis in each of the Show Cause Motions was that Doukas be found in contempt and ordered to comply with the Injunction. But rather than conceding his contempt and immediately complying with the Injunction, Doukas objected to the Show Cause Motions and failed to reverse his contumacious course of conduct.

Bavelis filed the First Show Cause Motion as a result of Doukas's execution of the Assignment of Judgment and Right to Bid at Sale, the document by which Doukas purported to transfer to his own company, Leftheris, GMAQ's Foreclosure Judgment and its right to bid at a foreclosure sale. In the First Doukas Response, Doukas argued that his execution of the Assignment of Judgment and Right to Bid at Sale was not contemptuous because Leftheris had been the owner of the Mortgage since before the Petition Date. In support of this argument, Doukas attached the Assignment of Mortgage to his re-

---

**8.** *See In re Nicole Energy Servs., Inc.,* No. 06–8028, 2007 WL 328608, at *5 (B.A.P. 6th Cir. Feb. 1, 2007).

sponse, which he filed on June 26, 2012, making this the first date that he disclosed the existence of the Assignment of Mortgage to Bavelis. *See* Contempt Op., 519 B.R. at 716 n.8. The Assignment of Mortgage, however, was one of the very documents to which Bavelis had been entitled to unfettered access since the Court issued the Injunction in December 2010. In other words, when Doukas attached the Assignment of Mortgage to his response, he effectively revealed that he had been in contempt of the Injunction for the year and a half time period following its issuance.[9]

Notwithstanding these facts, Doukas contends that he "purged any contempt of the [Injunction] when ... he attached the [Assignment of Mortgage] to his response to the [F]irst [S]how [C]ause [M]otion[.]" Doukas Objection at 3. His attorney also made this argument during the Fee Hearing. Tr. at 47–48. But this argument does not wash. The contemptuous conduct that was the subject of the First Show Cause Motion was not Doukas's failure to disclose the Assignment of Mortgage. Nor could it have been, as Bavelis was—as a result of Doukas's failure to provide him unfettered access to the Assignment of Mortgage—unaware of that document's existence when the First Show Cause Motion was filed. Instead, as noted above, the contemptuous conduct that was the subject of the First Show Cause Motion was Doukas's execution of the Assignment of Judgment and Right to Bid at Sale. Thus, the proper response to the filing of the First Show Motion on Doukas's part would have been for him to immediately

reverse the purported transfers of GMAQ's property interests. But rather than doing so, Doukas continued down his contemptuous path by filing the Assignment of Bid with the State Court in February 2013, purporting to transfer the successful bid from GMAQ to Leftheris and requesting that title to the O'Brien Property be issued in the name of Leftheris. As a result, Bavelis filed the Second Show Cause Motion in February 2013. In response to that motion, Doukas filed the Second Doukas Response, arguing once again that he was not in contempt. It was not until March 2013—nine months after the First Show Cause Motion was filed and several weeks after the filing of the Second Show Cause Motion—that Doukas caused Leftheris to reassign the foreclosure bid to GMAQ. The reassignment was made pursuant to an agreed order negotiated with the assistance of Bavelis's counsel. *See* Stipulated and Agreed Order, Adv. Doc. 284 ("Stipulated and Agreed Order").[10]

The foregoing history demonstrates that Doukas's contemptuous conduct required Bavelis to file two show cause motions and that the contempt continued for nine months after the first motion was filed. All along the way, Doukas argued that he had never been in contempt at all, requiring Bavelis to litigate the issue. Despite this, Doukas argues that he should not be held liable for the fees and expenses that Bavelis incurred in addressing the contempt. According to Doukas, in other words, as long as he ultimately ceases and desists from his contempt sometime after he is caught, he may engage in contuma-

9. Doukas continued to violate the provision of the Injunction that required him to provide unfettered access to documents even after he filed the First Doukas Response, for he did not attach the Quit Claim Deeds to the response or otherwise disclose them at that time.

10. Paragraph 6 of the Stipulated and Agreed Order stated that "[a]ll parties otherwise reserve their rights and claims without prejudice." Thus, Bavelis's claims that Doukas had engaged in contemptuous conduct were preserved.

cious conduct without facing any consequences—including the consequence of compensating the party who was forced to bring the contempt to the Court's attention. Doukas's counsel also advanced this position during the Fee Hearing. Tr. at 47. But this argument is wrong as a matter of law. The Sixth Circuit has held that courts have the authority to award attorneys' fees to compensate a party for "bringing [another party's] contempt to the court's attention[,]" including fees incurred in defending the contempt award on appeal. *Liberis,* 1988 WL 37450 at *8. In *Liberis,* "[s]ubsequent to the finding of civil contempt by the bankruptcy court, the trustee was forced to defend plaintiffs' challenges to the contempt order before the district court and then on appeal before this court." *Id.* The Sixth Circuit held that "the costs associated with these appeals were a direct result of the plaintiffs' initial contumacious conduct" because "[t]he trustee was forced to incur these costs to defend the contempt order on appeal, regardless of whether or not the actual contumacious conduct which had given rise to the contempt order had ceased." *Id.* Likewise, even if Doukas's contempt ceased around the time that the Court entered the Stipulated and Agreed Order in March 2013, the attorneys' fees and expenses that Bavelis seeks all were incurred as a result of Doukas's contempt. No reduction of the fees awarded to Bavelis will be made based on Doukas's specious argument that he purged his contempt.

Although this argument was the only one on which Doukas's counsel relied during the Fee Hearing, Tr. at 46–48, because the Court must state why it is rejecting "specific objections to a fee award," *Serv. Master,* 592 Fed.Appx. at 367, the Court will briefly address the other arguments Doukas made in his written objection. Like Doukas's argument based on the al-

leged purging of his contempt, his other arguments are wholly without merit.

### 2. Conference Time

██ Doukas raised an issue with the time billed "for several lawyers talking to one another." Doukas Objection at 4. There is, however, "no per se prohibition against awarding compensation for intra-office conferences." *In re Moss,* 320 B.R. 143, 158 (Bankr.E.D.Mich.2005). In *Moss,* the bankruptcy court found that "the time entries relating to intra-office conferences do contain sufficient detail for the Court to determine that they were necessary and beneficial to the administration of the bankruptcy case" where "they contain the names of the attorney involved in the conference ... and the specific issue(s) discussed in the conferences[,]" also noting that "the time spent in each conference was minimal." *Id.*

██ Applying the standards used in *Moss,* the Court finds that, although there are instances here in which multiple attorneys billed for the same conference with one another, the time billed for such conferences is relatively minimal and appropriate. The Court estimates the time billed by multiple attorneys for conferences with another attorney to be four hours. This amount of time for conferences between attorneys is reasonable, and no reduction of the fees awarded to Bavelis will be made based on this objection.

### 3. Post–Injunction Discovery Efforts

██ Doukas argued that the "post-injunction discovery efforts" engaged in by Bavelis's counsel were not undertaken as a result of his contempt. Doukas Objection at 6. To the contrary, as explained above, if Doukas had provided the Assignment of Mortgage and the Quit Claim Deeds to Bavelis promptly after the Injunction was issued—or at least informed him that they

were available in the public record rather than stating in response to document requests that no responsive documents existed—Bavelis's counsel would not have needed to incur this time. *See Contempt Op.*, 519 B.R. at 721. Accordingly, the Court concludes that the post-injunction efforts were undertaken as a result of Doukas's contempt. No reduction of the fees awarded to Bavelis will be made based on this objection.

### 4. Alleged Duplicative Services

 Doukas objected to AKSN's fees in their entirety, stating that "[t]his Objection does not analyze the AKSN bills" but that "[i]t is apparent that all those fees were duplicitous [sic] of the work of Special Litigation counsel." Doukas Objection at 6. If Doukas meant that AKSN's services were *duplicative* of the services provided by ZTL, the Court concludes that there was no unnecessary duplication. It is appropriate for special litigation counsel to consult with the Chapter 11 debtor's bankruptcy counsel. As McClatchey testified, because AKSN was Bavelis's bankruptcy counsel, it was reasonable for Little and Hogan, as special litigation counsel, to consult with Stovall in his capacity as bankruptcy counsel and for Stovall to have the limited involvement that he had in the contempt matter. Tr. at 35. No reduction of the fees awarded to Bavelis will be made based on this objection.

### 5. Alleged Mitigating Factors

 Doukas relied on several factors that he contends should mitigate his liability for contempt. He first points out that the State Court never granted a deed to Leftheris. Doukas Objection at 6. In other words, Doukas argues that he should not be held in contempt because he was unsuccessful in his ultimate goal of obtaining ownership of the asset that his contempt was designed to obtain. While the amount of Doukas's liability to Bavelis would have been greater if Doukas had been successful, Doukas's lack of success does nothing to absolve him of his contempt, nor does it limit Bavelis's entitlement to recover the attorneys' fees and expenses he incurred as a result of that contempt.

Doukas also contends that he retained and paid an attorney (Juan Zorrilla) to represent GMAQ in the State Court foreclosure litigation, that he paid certain related costs and that during the litigation he was responsible for a settlement with a title company in the amount of $250,000. Doukas Objection at 6–7 & n.3. Doukas, though, provided no evidence during the Fee Hearing or the Contempt Hearing to establish those contentions. Nor did he provide any authority for the proposition that any such actions on his part should reduce his liability for the attorneys' fees and expenses that Bavelis incurred as a result of Doukas's contempt. *Cf. Henry v. Assocs. Home Equity Servs., Inc. (In re Henry)*, 266 B.R. 457, 481 (Bankr.C.D.Cal. 2001) (noting that the defendant had "brought no authority to the court's attention that [would reduce] damages resulting from [its] contempt of court" by the benefit the defendant allegedly provided to the plaintiff).

It would be especially inappropriate to reduce Doukas's liability on the facts presented here. Any involvement that Doukas had in the State Court foreclosure litigation was designed to transfer assets from GMAQ to Doukas's wholly-owned company, Leftheris, not to benefit GMAQ or Bavelis. In fact, GMAQ's other counsel in the foreclosure litigation, Tracy Newmark, filed a document in the State Court on behalf of GMAQ stating that Doukas's Assignment of Bid from GMAQ to Leftheris was a "'fraud upon the [State]

[C]ourt'" and that the title to the O'Brien Property should only be in GMAQ's name." Contempt Op., 519 B.R. at 717. Doukas argues that this filing by Ms. Newmark on behalf of GMAQ prevented the State Court from issuing a deed to the O'Brien Property to Leftheris and that this fact should mitigate his liability for contempt. Doukas Objection at 7. As noted above, Doukas reassigned the foreclosure bid from Leftheris to GMAQ pursuant to the Stipulated and Agreed Order, which was negotiated with the assistance of Bavelis's counsel. The fact that GMAQ also incurred fees addressing Doukas's misconduct in no way negates Doukas's liability to Bavelis. No reduction of the fees awarded to Bavelis will be made based on Doukas's mitigation-based objections.

### 6. Alleged Criminal Nature of the Requested Sanction

██ Doukas contends that an award in the amount sought by Bavelis would be in the nature of a criminal sanction. *See* Doukas Objection at 7. Not so. The United States Supreme Court and the Sixth Circuit both have recognized that amounts awarded for contempt are civil in nature if they compensate the party seeking the award. *See Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 829, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) ("A contempt fine accordingly is considered civil and remedial if it either coerce[s] the defendant into compliance with the court's order, [or] ... compensate[s] the complainant for losses sustained.") (inter-

nal quotation marks omitted); *Williamson*, 467 Fed.Appx. at 396 ("In a civil contempt proceeding, judicial sanctions can be used not only to coerce compliance, but also to compensate the complainant") (internal quotation marks omitted). This includes attorneys' fees and expenses incurred as a result of contempt. *See Liberis*, 1988 WL 37450 at *8.

### C. Entry of Final Judgment

Because other claims against Doukas remain pending in this adversary proceeding, unless the Court directs otherwise, a judgment holding Doukas in contempt and awarding fees and expenses to Bavelis would not be final. *See, e.g., Doyle v. London Guar. & Accident Co.*, 204 U.S. 599, 603, 27 S.Ct. 313, 51 L.Ed. 641 (1907) ("[W]e deem it settled that an order punishing for contempt, made in the progress of the case, when not in the nature of [criminal contempt], is regarded as interlocutory, and to be reviewed only upon appeal from a final decree in the case."); *Cousins v. Bray*, 137 Fed.Appx. 755, 756 (6th Cir.2005) ("It is a long-standing rule of appellate jurisdiction that a judgment of civil contempt is not a final decree and therefore is not appealable in itself.") (internal quotation marks omitted). *Cf. United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 444 F.3d 462, 474 n. 7 (6th Cir.2006) ("Unlike a party, which can only immediately appeal an adjudication of criminal contempt, a nonparty can immediately appeal an adjudication of either civil or criminal contempt.").[11]

---

11. *See also August Tech. Corp. v. Camtek, Ltd.*, 542 Fed.Appx. 985, 994–95 (Fed.Cir.2013) (holding that a contempt order entered against a party to the litigation was not final and appealable, because the district court had not certified the order for immediate appeal). In *August Technology*, a patent infringement case, the Federal Circuit also stated in *dicta* that, "because the court's contempt order does not dispose of any *claims* in this case, the requirements for certification [for immediate appeal] are not satisfied[,]" *id.* at 994, doing so without elucidating why that would be the result on the facts before it. By contrast, as explained below, the Contempt Opinion and this opinion clearly dispose of Bavelis's contempt claim, and the requirements for

In his proposed findings of fact and conclusions of law (Adv.Doc. 608), Bavelis requests that the Court enter a final judgment holding Doukas in civil contempt and awarding fees and expenses to Bavelis. Rule 54(b) of the Federal Rules of Civil Procedure ("Civil Rule(s)"), made applicable by Rule 7054 of the Federal Rules of Bankruptcy Procedure, provides the authority for doing so. That rule permits a court to "direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Fed.R.Civ.P. 54(b). The Sixth Circuit has held that "[a] claim under [Civil] Rule 54(b) denotes the aggregate of operative facts which give rise to a right enforceable in the courts[.]" *GenCorp, Inc. v. Olin Corp.*, 390 F.3d 433, 442 (6th Cir.2004) (internal quotation marks omitted). Bavelis's request for a contempt judgment against Doukas fits the bill. As noted above, *see supra* note 7, the aggregate of operative facts supporting Bavelis's right to a contempt judgment against Doukas is separate and distinct from the aggregate of operative facts supporting the other claims Bavelis asserts against Doukas in this adversary proceeding.[12]

Civil Rule 54(b) "attempts to strike a balance between the undesirability of piecemeal appeals and the need for making review available at a time that best serves the needs of parties." *Pittman ex rel.*

*Sykes v. Franklin*, 282 Fed.Appx. 418, 430 (6th Cir.2008) (internal quotation marks omitted). The Sixth Circuit has used the following non-exhaustive list of factors in determining whether there is no just reason for delay:

(1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in set-off against the judgment sought to be made final; (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like. Depending upon the facts of the particular case, all or some of the above factors may bear upon the propriety of the trial court's discretion in certifying a judgment as final under [Civil] Rule 54(b).

*Corrosioneering, Inc. v. Thyssen Envtl. Sys., Inc.*, 807 F.2d 1279, 1283 (6th Cir. 1986).

Applying the relevant factors here, the Court determines that there is no just reason for delay in entering final judgment. The contempt matter before the Court is separate and distinct from Bavelis's other claims against Doukas in

certification for immediate appeal are met here.

12. A party seeking to immediately appeal a discovery order may do so by disobeying the order, being held in contempt and appealing the contempt order. *See, e.g, Church of Scientology of California v. United States*, 506 U.S. 9, 18 n. 11, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992) (stating that "a district court's order enforcing a discovery request is not a 'final order' subject to appellate review[,]" and that "[a] party that seeks to present an objection to

a discovery order immediately to a court of appeals must refuse compliance, be held in contempt, and then appeal the contempt order"). This path to appellate review recognized by the Supreme Court in *Church of Scientology* is viable only because the contempt order would be certifiable as final under Civil Rule 54(b). Thus, Civil Rule 54(b) must be available as a mechanism to make contempt judgments against parties final when, as here, there is no just reason for delay.

this adversary proceeding, there is no danger that an appeal of the Court's decision would be mooted or that it would be brought on appeal a second time. *See Pittman*, 282 Fed.Appx. at 431. Nor are there any pending claims by Doukas that "could result in set-off against the judgment sought to be made final." *Id.* (internal quotation marks omitted). Entry of final judgment is appropriate under these circumstances. *See Sara Lee Corp. v. Sycamore Family Bakery Inc.*, No. 09–cv–523, 2011 WL 3794237, at *2 (D.Utah Aug. 25, 2011) (certifying an award of attorneys' fees incurred as a result of a party's contempt to be a final order where the contempt proceeding was "separate and distinct from the issues relating to the remaining claims in the case" and "[t]he appellate court, therefore, would not have to decide the same issues more than once if there were subsequent appeals"); *Whole Living, Inc. v. Tolman*, No. 03–cv–272, 2004 WL 2733614, at *22 (D.Utah Nov. 29, 2004) (concluding that, pursuant to Civil Rule 54(b), there there was no just reason for delay in entering final judgment holding a party in contempt of the court's preliminary injunction).

The Court's consideration of the potential effect of delay also counsels in favor of entering final judgment. Doukas already has caused a delay in Bavelis's receipt of an award of fees and expenses, first by lodging baseless objections to the Fee Request, then by requesting that the Fee Hearing be rescheduled for what appears to have been a spurious reason. Further, Doukas's conduct in this case suggests that he will not pay the amount of the contempt judgment willingly. Rather, in order to recover on the judgment, Bavelis may need to look to Doukas's assets. As discussed above and in the Contempt Opinion, Doukas has a history of attempting to transfer assets in a fraudulent manner. Thus, a delay in the entry of final judg-ment would only give him more time to do so, potentially benefitting Doukas at the expense of Bavelis.

## VI. Conclusion

In light of the foregoing, the Court awards Bavelis $62,411.56 in fees and expenses and orders Doukas to pay that amount to Bavelis immediately. Contemporaneously with the issuance of this opinion and order, the Court will enter final judgment holding Doukas in civil contempt, awarding fees and expenses to Bavelis and certifying the judgment for immediate appeal under Civil Rule 54(b).

**IT IS SO ORDERED.**